Randy ALMOND, Kurt Koester, Michael Richardson, Ira Johnson, and Brewie Gibson Plaintiffs–Appellants,

v.

ABB INDUSTRIAL SYSTEMS, INC., Defendant–Appellee.

No. 01–3382.

United States Court of Appeals, Sixth Circuit.

Jan. 22, 2003.

Before BOGGS and COLE, Circuit Judges; and BELL, Chief District Judge.*

PER CURIAM.

Five plaintiffs appeal the district court's grant of summary judgment for defendant,

* The Honorable Robert Holmes Bell, Chief United States District Judge for the Western District of Michigan, sitting by designation.

their former employer, ABB Industrial Systems ("ABB"), on their claims under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634, and the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001–1461. Plaintiffs alleged that they were terminated because they were over forty years old, in violation of ADEA § 4, 29 U.S.C. § 623, and in order to interfere with their employment benefits, in violation of ERISA § 510, 29 U.S.C. § 1140. The district court dismissed the ADEA claim of one plaintiff as untimely filed with the Equal Employment Opportunity Commission ("EEOC") and granted summary judgment on the remaining ADEA claims to ABB for lack of evidence of age discrimination. The district court also granted summary judgment to ABB on the ERISA claims of three plaintiffs who had signed releases of their ERISA claims and on the remaining ERISA claims for lack of evidence of intent to interfere with pension rights. We affirm.

## I

ABB is a United States subsidiary of a Swiss corporation in the business of designing, manufacturing, selling, and servicing industrial process automation and control equipment. From 1990 through 1995, ABB experienced severe financial difficulties and, in order to stay afloat, the corporation instructed managers to reduce costs aggressively. As ABB's largest expenditure was labor, this entailed significant employee terminations. The company established no written criteria for termination and left discretion regarding whom to terminate in order to meet budget targets with individual managers, many of whom were without experience in either employee termination or age discrimination law. On December 31, 1992, ABB terminated Brewie Gibson (Mechanical Designer, age 48). On November 26, 1993,

ABB terminated four more long-time employees, Kurt Koester (Senior Engineer, age 55), Michael Richardson (Order Entry Clerk, age 44), Randy Almond (Senior Electronic Technician, age 52) and Ira Johnson (Test Engineer, age 45).

On July 18, 1995, all five employees sued ABB for age discrimination, in violation of ADEA, and for interference with attainment of pension benefits, in violation of ERISA. On July 1, 1998, the district court dismissed the ERISA claims of Koester, Richardson, and Almond because they had signed releases, and Gibson's ADEA claim as being untimely filed with the EEOC. On March 6, 2001, the district court granted summary judgment to ABB on the remaining claims. Plaintiffs now appeal the grants of summary judgment for ABB on Koester's, Richardson's, Almond's, and Johnson's ADEA claims, the dismissal of Gibson's ADEA claim as untimely and the summary judgment on Johnson's and Gibson's ERISA claims.

## II

Under the ADEA, it is "unlawful for an employer ... to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). To establish a prima facie circumstantial age discrimination claim when an employer performs a reduction in force, the plaintiff must introduce evidence sufficient to support a finding that "(1) he was a member of the protected class, (2) he was subjected to an adverse employment action, (3) he was qualified for the particular position," and (4) "additional direct, circumstantial or statistical evidence tending to indicate that the employer singled out the plaintiff for impermissible rea-

sons." *Godfredson v. Hess & Clark, Inc.,* 173 F.3d 365, 371 (6th Cir.1999) (internal quotation marks and alterations omitted). We have interpreted the last finding as a requirement that the "plaintiff must present evidence of actions taken by the employer which, if unexplained, are more likely than not based on consideration of impermissible factors." *Allen v. Diebold, Inc.,* 33 F.3d 674, 678 (6th Cir.1994) (citing *Tex. Dep't of Cmty Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

■ Plaintiffs here argue that in considering a motion for summary judgment against them, the court must entirely ignore all testimony by witnesses associated with the defendant. "[T]he court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, *at least* to the extent that that evidence comes from disinterested witnesses.'" *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 151, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (emphasis added, quoting 9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2529 at 300 (2d ed.1995)). However, this interpretation of the summary judgment standard both over-reads *Reeves* and leads to absurd consequences. If plaintiffs were correct, there could be no summary judgment for the defendant after the plaintiff makes a prima facie case as the defendant's proffered non-discriminatory reason by necessity has to be provided by defendant's witnesses. *See Manzer v. Diamond Shamrock Chems. Co.,* 29 F.3d 1078, 1084 (6th Cir.1994); *see also Reeves,* 530 U.S. at 148–49 (contemplating that at least some evidence provided by the employer may be considered on summary judgment).

Moreover, the summary judgment standard does not require the exclusion of all interested testimony. At summary judgment, the judge may consider all "evidence [favorable to the movant] that the jury is required to believe." Wright & Miller, *supra,* § 2529, at 299. Such evidence includes "uncontradicted and unimpeached evidence from disinterested witnesses," but under some circumstances even the testimony of an "interested witness ... must be believed." Wright & Miller, *supra,* § 2527, at 287–88. In particular, "[t]he testimony of an employee of the [movant] must be taken as true when it disclosed no lack of candor, the witness was not impeached, his credibility was not questioned, and the accuracy of his testimony was not controverted by evidence, although if it were inaccurate it readily could have been shown to be so." Wright & Miller, *supra,* § 2527, at 287 n. 9 (citing *Chesapeake & Ohio R.R. v. Martin,* 283 U.S. 209, 216, 51 S.Ct. 453, 75 L.Ed. 983 (1931)). Even the testimony of the moving party that "is not contradicted by direct evidence, nor by any legitimate inferences from the evidence, and ... is not opposed to the probabilities, nor, in its nature, surprising or suspicious, [need not be] den[ied] conclusiveness." *Chesapeake & Ohio R.R.,* 283 U.S. at 218.

In the present case, there is no dispute regarding the first part of the prima facie case, as all plaintiffs were older than forty years and therefore within the ADEA's protected class, or the second part of the prima facie case, as all plaintiffs were terminated, undisputedly an adverse employment action. All plaintiffs generally received positive performance ratings (fours and fives on the company's six-point scale) and the district court held all but two of the plaintiffs to be qualified for their positions. In the case of Koester, the district court declined to make a finding as it was a "close question" and the court found the claim barred under the fourth part of the test regardless. In the case of Gibson, the

case was dismissed as untimely filed, almost three years before summary judgment was granted on the other plaintiffs' claims, so the court never reached the question of qualification. Here, we assume that all plaintiffs would have been able to make the first three elements of their prima facie case and focus on the final element, "evidence of actions taken by the employer which, if unexplained, are more likely than not based on consideration of impermissible factors." *Allen,* 33 F.3d at 678. Since there is no direct evidence of age discrimination alleged, the plaintiffs must establish a statistical or circumstantial case.

Both parties attempted to prove their case based on plant-wide statistical evidence regarding the terminations during the 1990 through 1995 period. While ABB introduced a sophisticated analysis by two professional statisticians, which found no support for the hypothesis that age discrimination was involved in ABB's terminations, plaintiffs' own proffered statistical evidence, standing alone, is sufficient to support summary judgment against them on this issue. Plaintiffs relied for statistical analysis on a summary of the company's data prepared by plaintiff Richardson.[1]

ABB's Reduction in Force over Time

| Year | Employees | Terminations | Average Age of Employees | % over 40 of Employees | % over 40 of Terminees | Diff. |
|------|-----------|--------------|--------------------------|------------------------|------------------------|-------|
| 1990 | 1136 | 236 | 39.1 years | 45.6% | 47% | 0.014 |
| 1991 | 902 | 45 | 40.2 years | 50.5% | 64% | 0.135 |
| 1992 | 873 | 65 | 40.8 years | 52.9% | 57% | 0.041 |
| 1993 | 769 | 93 | 41.7 years | 55.9% | 72% | 0.161 |
| 1994 | 647 | 19 | 42.1 years | 57.8% | 79% | 0.212 |
| 1995 | 539 | 21 | 43.4 years | 62.2% | 79% | 0.168 |
| | 53% decline | 479 total | 4.3 years increase | 52.9% average | 57% average | 0.041[2] |

The district court called plaintiffs' statistics "crude" and insufficient to establish the suspicious circumstances test. The district court was wrong in the former-the statistics, while simpler than ABB's chi-squared analysis, are telling, but against plaintiffs rather than for them. In *Godfredson,* we held that the plaintiff failed to meet the burden of presenting additional suspicious circumstances where more than half of the employees terminated in a reduction in force were outside the protected class. 173 F.3d at 373. Here, ABB met

that standard in the first year, comprising about half of all terminations, and would have difficulty reaching it in later years because by then a majority of the workers were at least forty years of age. Over the period as a whole, the percentage of older employees who were terminated was only 4.1 percentage points higher than the fraction of older employees at the plant as a whole and employees within the protected class were less than 7.8% more likely to be terminated than employees outside the protected class. While in some years, no-

---

1. Plaintiff Richardson criticized minor discrepancies in the company data. The district court dismissed these as insignificant and we agree.

2. This table is based on Richardson's table, but also includes some additional uncontroverted data and numerical summaries and was adjusted very slightly for admitted discrepancies on when the age of employees and terminees was measured.

tably 1993–95, the discrepancy in age distribution between the workforce and the terminees seemed quite large, in the same years the basis, that is, the number of terminees, was quite small, permitting large fractional disparities by operation of chance alone. *See Simpson v. Midland–Ross Corp.,* 823 F.2d 937, 943 & n. 7 (6th Cir.1987) (holding statistics based on small samples to be inherently suspect). While there seems to have been an overall small statistical disparity between the terminations of older and younger employees, it was far too faint as to allow any reasonable juror to find the suspicious circumstances of the prima facie case.

The change in the age distribution of ABB's workforce during the reduction in force also tends to disprove age discrimination. In the absence of any new hiring, retirements or deaths among the employees, the workforce would have aged by five years over the five-year period. Alternatively, if the age distribution of those leaving and entering employment is the same as that of the workforce, one would also expect the workforce to age a year, every year. Given that, for reasons not prohibited by ADEA, new workers first entering the job market tend to be younger than the average of the workforce, while those employees who die or choose to retire tend to be older than the average of the workforce, one would expect a workforce to age considerably less than five years. *See Simpson,* 823 F.2d at 943 (discussing the inevitable changes in workforce age distribution). For a workforce to age by more than five years, it would be necessary for an employer deliberately to hire older employees and terminate younger employees just to overcompensate for the effects of mortality. By comparison, for an employer with a steady age distribution of em-

ployees, the average age of the workforce would not increase at all.

In the present case, the average age of ABB's workforce increased by 4.3 years over a five-year period, approaching the maximum possible without discriminating against younger workers and ignoring the non-discriminatory effects tending to reduce the aging of the workforce.[3] In previous ADEA cases concerning reductions in force over a brief period of time, we have held increases, and even small decreases, in average worker age to be contraindicative of age discrimination against older employees. *Compare Varga v. Rockwell Intern. Corp.,* 242 F.3d 693, 701 (6th Cir.2001) (holding evidence that reduction in force resulted in a 0.1 years decline in average workforce age to be statistically insignificant), *Ridenour v. Lawson Co.,* 791 F.2d 52, 57 (6th Cir.1986) (finding no statistical evidence of age discrimination where "layoffs resulted in an increase of the average age of . . . employees from 41.28 to 41.72, not a decrease as would be expected if age discrimination were a factor"), *and Simpson,* 823 F.3d at 944 (rejecting "any assertion that a decreasing average employee age coupled with other questionable statistics proves the existence of impermissible age discrimination"), *with Scott v. Goodyear Tire & Rubber Co.,* 160 F.3d 1121, 1129 (6th Cir. 1998) (detecting prima facie statistical evidence of age discrimination where terminees were on average seven years older than those not terminated). For similar reasons, we decline to recognize statistical evidence of age discrimination in a reduction in force extending over years where the aging of the workforce approached the length of reduction in force. In the absence of plant-wide suspicious circumstances, we turn to the individual circum-

---

**3.** We note that if ABB attempted to rid itself of older employees under the guise of a reduction in force, as plaintiffs contend, it was singularly unsuccessful.

stances for each plaintiff whose case reached a determination on the merits in the court below.

■ The only suspicious circumstances that Koester alleged regarding his termination is that he was the oldest employee of eight in the department and that his supervisor had available a list of employees in the department including salary and tenure information, not including age. However, the mere fact that a terminated employee is the oldest in his department is insufficient to create suspicious circumstances under the ADEA. *See, e.g., Leonard v. Sundstrand Corp.,* 2000 WL 307390 (7th Cir.2000) (unpublished); *Godfredson v. Hess & Clark, Inc.,* 996 F.Supp. 730, 739 (N.D.Ohio 1998) (citing *Langston v. Carraway Methodist Hosps.,* 840 F.Supp. 854, 867 (N.D.Ala.1993)). According to the list, Koester was the most highly paid employee in the department, but his tenure was in the middle of the range and hence did not by itself suggest that Koester was older than the other employees. The existence of the list by itself does not allow an inference that the supervisor used it to decide whom to terminate and even if he did use that information, it does not raise the question of age discrimination, as age was not on the list. Therefore, Koester failed to establish suspicious circumstances and hence failed to make his prima facie case.

■ Richardson gives as individual suspicious circumstances that: (1) he was the oldest employee of his department; (2) the only other employee in the same position as Richardson was outside the protected class and retained; and (3) he was not recalled to his position when the retained employee voluntarily left the position a few weeks after Richardson's termination. The first circumstance will avail him no more than Koester. The second circumstance cannot be sufficient to raise suspi-

cion, as with only two employees, one inside and one outside the protected class, even in the absence of any discriminatory motive, mere chance will result in the termination of the employee in the protected class half the time. As for the third circumstance, we have held that "[w]here an employer reduces his workforce for economic reasons, it incurs no duty to transfer an employee to another position within the company." *Ridenour,* 791 F.2d at 57. A fortiori, an employer has no duty to recall laid-off employees when a new position opens up. Therefore, Richardson failed to make his prima facie case.

■ Almond raises as suspicious circumstances that: (1) he was the oldest employee in department; and (2) after being informed of his discharge he was not offered another newly opened position with the company for which he claims he was qualified. The first circumstance is, again, legally insufficient for the same reason it was insufficient for Koester and Richardson. The second circumstance was disposed of by this court in *Ridenour.* Therefore, Almond failed to make his prima facie case.

■ Johnson raises the suspicious circumstances that: (1) he was one of the oldest employees of the department; (2) two younger employees were retained in positions that he could have performed; (3) a younger terminated employee was asked to return to ABB as a regular employee later; and (4) fourteen of nineteen employees terminated same day were within the protected group. Once again, the first circumstance will not avail Johnson any more than his co-plaintiffs. The second and third circumstances will not raise a suspicion of discriminatory intent under the holding of *Ridenour.* The fourth circumstance is also not suspicious, as, at the time of Johnson's termination,

the workforce at the plant was such that picking employees completely at random would on average have resulted in eleven terminations of employees at least forty years old, only slightly less than fourteen and easily explained by random variation in a small sample. *See Simpson,* 823 F.2d at 943 (finding age disparity in a sample of seventeen to be insufficient to support an allegation of age discrimination). Hence, Johnson's prima facie case must fail as well.

### III

An employment discrimination claim must be filed with the EEOC within one-hundred-and-eighty days after the allegedly unlawful practice occurred. 42 U.S.C. § 2000e–5(e). If the employee first files with a state or local anti-discrimination agency, this period is lengthened to three hundred days. *Ibid.* This statute of limitation begins to run when the employee is first notified of the allegedly unlawful employment practice. *Del. State Coll. v. Ricks,* 449 U.S. 250, 259, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980). In this case, Gibson filed his charge with the Ohio Civil Rights Commission and the EEOC on September 2, 1993. Hence, his complaint was timely if and only if he became aware of his termination no earlier than November 6, 1992, three hundred days before. Gibson received his official notice of termination on that very date. Therefore, the question of timeliness turns on whether Gibson knew that he was to be discharged before receiving his official notice.

On October 22, 1992, two weeks before the official notice, Gibson sent a memorandum to management applying for a different position within the company. During his deposition, Gibson testified as follows:

A: ... In fact, I applied for that job before I got laid off or after I found that I got laid off. I wrote a memo and applied for the same job that I had previously, six years earlier, which was ECN coordinator ...

Q: And that was before you were laid off?

A: No, that was after I was laid off. I applied for the job.

Q: That was after you knew you were being laid off?

A: Yeah. In fact that job at that time was in Ken Morris' group, and I applied for it to whoever was in that position.

At trial, based on this testimony, ABB moved for partial summary judgment against Gibson for untimeliness. Gibson opposed the motion based on the single-filing rule.[4] On June 1, 1998, the district court rejected Gibson's argument and granted ABB's motion.

On March 15, 1999, Gibson moved for reconsideration of ABB's motion for partial summary judgment. In support of his motion, Gibson submitted an affidavit in which he averred that he had not known of his termination prior to November 6. Gibson also pointed to several statements in

---

4.
 The "single filing rule," which allows the administrative charge of one plaintiff to satisfy the charge filing obligations of other plaintiffs, was recognized by this Court in the context of a Title VII case in *EEOC v. Wilson Metal Casket Co.,* 24 F.3d 836 (6th Cir.1994).... We join those courts in holding that the single filing rule applies to ADEA cases.

*Howlett v. Holiday Inns, Inc.,* 49 F.3d 189, 194 (6th Cir.1995). The district court, relying on *Laffey v. Northwest Airlines, Inc.,* 567 F.2d 429, 472 (D.C.Cir.1976), rejected the application of the single filing rule here because the timely filing of the other plaintiff's EEOC complaints could not revive a complaint which was already dead when the other plaintiff's complaint first arose. Plaintiffs did not challenge this ruling on appeal.

the transcripts of his deposition in which he indicated that he was unsure about his testimony, that he could have been mistaken regarding the date of the memorandum, that he had heard only rumors regarding potential layoffs and that he was shocked when he actually received his notice of termination on November 6. Moreover, Gibson pointed out the lack of any other documentary or testimonial evidence establishing how he could have been informed of his termination before the official notice. As over nine months had passed since the partial summary judgment, Fed.R.Civ.P. 59(e) was unavailable, and the district court considered the motion under Fed.R.Civ.P. 60(b). The district court rejected Gibson's motion because of his "failure to earlier assert the theory that his claim was in fact timely filed does not constitute the kind of mistake or excusable neglect that warrants relief from judgment," the district court denied the motion for reconsideration and Gibson appealed.

 We affirm the district court's grant of partial summary judgment to ABB on Gibson's ADEA claim. "This court reviews grants of summary judgment de novo, under the same standard as the district court." *Cornist v. B.J.T. Auto Sales, Inc.,* 272 F.3d 322, 326 (6th Cir. 2001). At the time of ABB's motion for summary judgment, there was no genuine issue of material fact regarding whether Gibson knew that he was going to be terminated on October 22. Instead, Gibson argued exclusively that his claim was timely because of the single-filing rule. Therefore the trial court was justified in finding that Gibson knew on October 22 and that the motion hence was untimely. We also affirm the district court's denial of a motion for reconsideration. Regardless of whether Gibson had no notice of his termination beyond rumors until November 6,

by failing to make this factual argument in opposition to the original motion for partial summary judgment, he procedurally forfeited his claim. "On an appeal from the denial of a motion for relief from judgment under Rule 60(b), the Court of Appeals may review the ruling for abuse of discretion ... but an appeal from denial of Rule 60(b) relief does not bring up the underlying judgment for review." *Hood v. Hood,* 59 F.3d 40, 42 (6th Cir.1995) (quoting *Browder v. Director, Dep't of Corr.,* 434 U.S. 257, 263 n. 7, 98 S.Ct. 556, 54 L.Ed.2d 521 (1978)) (internal quotation marks and alterations omitted). "It is well established, however, that a district court does not abuse its discretion in denying a Rule 59 motion [to reconsider] when it is premised on evidence that the party had in his control prior to the original entry of judgment." *Emmons v. McLaughlin,* 874 F.2d 351, 358 (6th Cir.1989). This court cannot be more lenient with respect to a belated motion to reconsider under Rule 60(b), than to a timely motion to reconsider under Rule 59(e). All the evidence that Gibson pointed to in his motion to reconsider had been available to him at the time of the motion for summary judgment. Gibson claims that he was unable to afford a transcript of his deposition at the time of summary judgment. But even if that was the case, this cannot excuse Gibson's failure to contest the claim that he was aware of his termination on October 22. As Gibson was able to swear, at the time of the motion for reconsideration, that he was unaware that he was being terminated on October 22, he must also have known this nine months earlier, at the time of the motion for summary judgment, even without the aid of a transcript. He should have brought this fact to the court's attention then and, by failing to do so, forfeited his claim.

## IV

ERISA § 510 makes it unlawful to "discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary [of an employee benefit plan] for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan." 29 U.S.C. § 1140. To make out a prima facie case under this section, a plaintiff must show (1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which an employee may become entitled. *Smith v. Ameritech*, 129 F.3d 857, 865 (6th Cir. 1997) (quoting *Humphreys v. Bellaire Corp.*, 966 F.2d 1037, 1043 (6th Cir.1992)). An employer can rebut a prima facie case by introducing "evidence of a legitimate, nondiscriminatory reason for its challenged action." *Ibid.* "This shifts the burden back to the plaintiff to show that the employer's proffered reason was mere pretext. Although the plaintiff need not show that the employer's sole purpose . . . was to interfere with plaintiff's entitlement to benefits, he must either prove that the interference was a motivating factor in the employer's actions or prove that employer's proffered reason is unworthy of credence. Summary judgment is appropriate if plaintiff fails to establish a prima facie case or fails to rebut the employer's proffer of a legitimate, nondiscriminatory reason for its actions." *Ibid.* (internal citations, quotation marks and alterations omitted).

While ABB offers its employees numerous benefit plans covered under ERISA, Johnson's and Gibson's termination did not affect their eligibility for most of them because they had either already fully vested in the plans or were, due to other circumstances, never going to achieve these benefits. Gibson would have qualified for the Preserved Early Retirement Benefit after a further year and a half with ABB and for the Retiree Medical Benefit after a further seven years with ABB. Johnson would have qualified for the Retiree Medical Benefit after ten more years with ABB. While we have not ruled on how close an terminated employee must have been to vesting in a benefit in order to raise the interference of a motive of ERISA § 510 discrimination on this basis alone, the district court reviewed the case law in other courts and found unanimity in holding that the periods in question here are too long to raise such an inference. Gibson and Johnson also argue that ABB's contribution to employee's 401(k) plans increased with the age of the employee, which gave ABB an incentive to terminate older employees. However, the difference in 401(k) plan contributions between Gibson and non-terminated younger employees in similar positions was on the order of only a few hundred dollars a year. On grounds no stronger than this, plaintiffs repeatedly claim to have "clearly" established their prima facie case. The district court disagreed and granted summary judgment to ABB for plaintiff's failure to make their prima facie case. We affirm.

## V

We **AFFIRM** the grant of summary judgment to ABB.